**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| HANNAH M. BURNS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 08-cv-574-TLW |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of the Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Plaintiff Hannah M. Burns, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), requests judicial review of the decision of the Commissioner of the Social Security Administration denying plaintiff's applications for disability benefits under Titles II and XVI of the Social Security Act ("Act"). In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before the undersigned United States Magistrate Judge.[1] (Dkt. # 13). Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.

**Review**

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous

---

[1] Plaintiff's record begins in her former name, Hannah M. Jackson. She subsequently married and changed her last name to Burns. (R. 103).

work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

The role of the court in reviewing a decision of the Commissioner under 42 U.S.C. § 405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings,

not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a).

## **Background**

Plaintiff was born January 7, 1975 and was 32 years old at the time of the Administrative Law Judge's ("ALJ") final decision on December 27, 2007.[2] (R. 72, 411). Plaintiff graduated high school and completed an associate's degree in graphic art.[3] (R. 412). Plaintiff's prior work history consists of a cashier for a fast food restaurant (2002-2003) and a waitress (2003-2004). (R. 117, 483). Plaintiff quit her last job on June 1, 2004, the date on which she alleges she became unable to work. (R. 72, 117).

The ALJ asked plaintiff to explain the conditions she believed kept her from working. Throughout the record, plaintiff complained of back pain, general pain, incontinence, headaches, trouble with her eyes (R. 130), learning disabilities, and trouble sleeping longer than two (2) hours at a time. (R. 80, 82, 87, 88, 97, 101, 110, 130).

At the initial hearing, plaintiff testified she has trouble in general with her vision and that

---

[2] Plaintiff's application for disability was denied initially and upon reconsideration. (R. 33, 41-44, 32, 34-36). A hearing before ALJ Gene M. Kelly was held October 3, 2006, (R. 404-459), and a supplemental hearing was held November 8, 2007 (R. 460-488), in Tulsa, Oklahoma. By decision dated December 27, 2007, the ALJ found that plaintiff was not disabled at any time through the date of the decision. (R. 14-31). On August 20, 2008, the Appeals Council denied review of the ALJ's findings. (R. 6-8). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481. The adjucated time frame for this claim is July 30, 2004 to December 27, 2007, although plaintiff only met the insured status requirements through June 30, 2007.

[3] Plaintiff claimed it "took [her] 12 years" to complete her degree. (R. 412).

physicians who diagnosed her son with X-linked ocular albinoism[4] thought "that [is] probably what [she] has." (R. 416). She claimed to also have nystagmus,[5] and she claimed surgery would not help improve her eyesight due to this condition. (R. 417).

Plaintiff explained the issues she faces with back pain to the ALJ. (R. 417-419). The ALJ inquired how often plaintiff drives and if she has difficulties. She answered she averages driving 75 miles per week, with the only difficulty being that her left foot will "get[] numb a lot." (R. 420). When questioned about her hands and arms, plaintiff stated she had no difficulty operating the steering wheel, gear selector or turn signal control. (R. 419). Plaintiff then mentioned she drops plates or cups at times because her hands go numb. She also stated she has a "lack of grip" in her hands and that they cramp frequently. (R. 420-421).

The ALJ asked plaintiff if she had any difficulty reaching in any direction, and she replied that she occasionally receives a spasm in her back or arm if she reaches "too hard for something or too high." (R. 421). She then explained her headaches to the ALJ, stating she experiences intense pain with the headaches, cannot drive or leave the house, and that she must lie down in darkness and without noise. Plaintiff informed the ALJ that her doctor prescribed Seroquel for her headaches and that it reduced the frequency to approximately two to three times a week, and reduced the intensity of the pain. (R. 421-422).

Plaintiff went on to describe problems she experiences with her stomach, from acid reflux to cramps. (R. 423). The ALJ then questioned plaintiff about a variety of complaints he noted,

---

[4] "Ocular albinism is a genetic disorder characterized by vision abnormalities in affected males. Vision deficits are present at birth and do not become more severe over time. Affected individuals have normal skin pigmentation. Ocular albinism is inherited as an X-linked recessive genetic condition." See www.webmd.com/eye-health/albinism-ocular.
[5] Nystagmus is a name for rapid involuntary eye movements. See www.nlm.nih.gov/medlineplus/ency/article/003037.

4

and plaintiff explained neck problems, issues with her feet and legs, heart problems, and medication side effects. (R. 423-427).

The ALJ questioned plaintiff about her issues with depression, asking if she had seen a counselor. Plaintiff explained she had not, due to insurance issues. (R. 427). She spoke of memory issues that she attributed to depression, of days where she did not want to be around people and other days where she craved interaction, and of things she tried to do instead of medication to relieve her symptoms. (R. 427-428).

Plaintiff's husband then testified to her changes in mood over the prior eighteen months. He discussed plaintiff's decline into depression, including angry outbursts and crying. He mentioned the problems his wife encountered physically and that she could no longer take care of tasks such as dishes and laundry. (R. 440-443). He also stated plaintiff's mental problems had caused severe problems in their marriage, and they had split up at least a dozen times in the previous year. (R. 443).

At the supplemental hearing held November 8, 2007, plaintiff testified regarding her back problems, headaches, and depression over the year since the first hearing. (R. 470-473). She stated she is able to stand for approximately 30 minutes before needing to sit. (R. 474). She claimed her sleep is broken during the night by nightmares. (R. 475-476). She also claimed she has no energy and "can[not] seem to get around at all" approximately 20 days of the month. (R. 476). She discussed problems with concentration, and that she was in therapy at Grand Lake Mental Health Center. (R. 477-478).

The record contains several medical records, including those from plaintiff's treating physician, medical testing, and state consultative examinations. (R. 144-308, 316-320, 348-351, 371-403). These records show plaintiff was diagnosed with depression, anxiety, obsessive

compulsive disorder, migraine headaches, and bipolar disorder. (R. 187, 225, 237, 239, 275-277, 302, 309-310, 329-330, 334-335, 346, 354, 373-374, 376, 402). Plaintiff received a "severe head injury" in an automobile accident (R. 309), and in 2004 suffered injuries to her back, head and ankle when she fell from a bus. (R. 297, 309). She has complaints of migraine headaches, back and shoulder pain, neck, hip, and knee pain, problems with her feet, arms and hands. (R. 147, 188, 197-198, 201, 203, 205, 208-211, 216-217, 223-224, 228-230, 297, 322, 324, 327-331, 373-377).

Plaintiff was examined by three (3) agency consultative examiners, Beth Teegarden, D.O. (November, 2004), John W. Hickman, Ph.D. (November, 2006), Sri H. Reddy, M.D. (December, 2006), and Diane H. Williamson, Ed.D. (May, 2007) to assess her cognitive skills in conjunction with her request for job training services through the Oklahoma Department of Rehabilitation Services.

After examination, Dr. Teegarden asserted the following assessment of plaintiff:

This is a 29-year-old white female who presented for Social Security benefit evaluation with history of:

1. Chronic headaches with a history of nystagmus and stigmatism. The patient is having headaches at least every other day, which are incapacitating. She is unable to do anything other than lie down. These sound like migraine headaches although the patient feels it is associated with her progressively worsening vision.
2. Chronic lower back pain. The patient has been unable to obtain an MRI due to financial difficulties.
3. Chronic neck pain.
4. Right shoulder pain.
5. Reflux.
6. Rule out depression.

(R. 150). Dr. Teegarden mentioned in her examination notes plaintiff's grip strength was "5/5 bilaterally strong and firm. She is able to do both gross and fine manipulation with the hands."

(R. 149). She also noted "give-way weakness in the right hand, wrist, and shoulder. The patient has decreased hip flexion bilaterally at 80 degrees due to back pain." Id. Plaintiff's straight leg raising reflex was positive bilaterally in both the sitting and supine positions. Id. Also noted was a decreased pin-prick sensation in the entire right upper extremity. Id. In her mental status evaluation, Dr. Teegarden noted plaintiff's thought processes appeared normal and no signs of overt pathology were noted. (R. 149-150).

Dr. Hickman examined plaintiff on November 15, 2006, administering the Mental Status Exam, the Wechsler Adult Intelligence Scale-III, the Wide Range Achievement Test-3rd Edition, the Wechsler Memory Scale-III, the Lafayette Grooved Pegboard Test, the Beck Depression Inventory-II, the Minnesota Multiphasic Personality Inventory-2, and the Halstead-Reitan Batter of Neuropsychological Tests. Dr. Hickman concluded the following:

DIAGNOSIS

| | |
|---|---|
| Axis I | Bipolar disorder, mixed type<br>Anxiety disorder with panic attacks |
| Axis II | No diagnoses |
| Axis III | Migraine headaches, intermittent right-sided weakness, partial agenesis of the posterior portion of the corpus callosum in the area of the splenium with an associated intraventricular lipoma, gastroesophageal reflux disease, chronic back pain, high nystagmus, and dry eyes |
| Axis IV | Marked psychosocial stress from financial stress and social isolation |
| Axis V | GAF – 55, mild emotional and marked concentration, retrieval and motor difficulties |

PROGNOSIS

I would anticipate continued improvement in Ms. Burns' functioning if she continues taking her mood control medication. Her severely slow and weak motor functions in her upper extremities are problematic for repetitive manual tasks.

(R. 302-303). Dr. Hickman noted plaintiff's score of 25 on the Beck Depression Inventory-II indicated moderate depression. (R. 302). Dr. Hickman also completed a Mental Residual Functional Capacity form in addition to his written report. (R. 304-308). Dr. Hickman rated plaintiff to have moderate limitation on her ability to maintain attention and concentration for extended periods, and all other areas were checked either no limitation or no significant limitation. (R. 304-307).

Dr. Reddy performed a physical examination of plaintiff on December 19, 2006. His impressions were as follows:

> **Impression:**
> 1. Low back pain.
>     a. Lumbar disk disease from L4 to S1.
> 2. Neck pain.
> 3. Left knee pain with osteoarthritis.
> 4. GERD.
> 5. Migraine headaches.
> 6. Depression and Bipolar Disorder.
> 7. Normal hepatobiliary scan in 03/2005.
> 8. Normal ultrasound of gall bladder in 03/2005.
> 9. Normal x-rays and MRI of cervical spine in 10/2005.
> 10. Normal x-rays of left ankle and both hands in 11/2006.

(R. 289). Dr. Reddy also completed a physical RFC for plaintiff. (R. 290-296). In Dr. Reddy's opinion, plaintiff was able to sit for an entire 8-hour workday, stand for six (6) of those eight (8) hours, and walk for six (6) of those eight (8) hours, both at one time and for the duration of the day. He felt she was able to frequently lift up to 50 pounds, carrying up to 25 pounds. (R. 290). He indicated plaintiff was not limited in her repetitive push/pull ability with leg controls, or her grasping and fingering ability with repetitive movement. (R. 291). Dr. Reddy found plaintiff only occasionally able to bend, squat, crawl, climb and reach. Id. Dr. Reddy noted "mild degenerative changes in the lumbar spine and the l[eft] knee (x-ray and physical exam)." Id. He

also completed a "Range of Joint Motion Evaluation Chart," stating plaintiff experienced pain and decreased range of motion in her back on extension and flexion, and back lateral flexion. He noted pain and reduced range of motion on her left knee also. (R. 293). All others were rated normal. (R. 293-295).

Plaintiff was seen by Diane Williamson, Ed.D., on May 9, 2007 to "evaluate her cognitive skills pursuant to her request for job training services through the Oklahoma Department of Rehabilitation Services." (R. 316). Ms. Williamson applied the procedures of an interview with observations, Wechsler Adult Intelligence Scale-III, and Woodcock-Johnson Tests of Achievement (letter-word identification, paragraph comprehension, calculation, and applied math). Id. Ms. Williamson noted plaintiff "hope[d] to work in advertising after she complete[d] her school." Id. Ms. Williamson's summary of her evaluation of plaintiff is as follows:

> The results of this psychological examination describe Ms. Burns as an intelligent woman who exhibits very scattered and uneven patterns of cognitive skills. Her deficits are found on tasks that demand attention-concentration, retrieval of stored data, and speed of information processing. Her strengths suggest high average to superior knowledge of word meanings, visual-spatial organization, and the capacity to perform simple mental computation.
>
> These findings suggest that Ms. Burns possesses the reading skills needed to complete a college level training program that is primarily verbal in content. She could benefit from remedial courses, the services of a tutor, and participation in study groups for math. She is likely to benefit from extended time for tests. She should continue to consult with her physician regarding her use of medications to manage her attention deficit disorder and her mood disorder.

(R. 318).

The first agency RFC in plaintiff's record is a mental one, dated January 6, 2005 and completed by Tom Shadid, Ph.D., showing plaintiff's impairment (12.04 Affective Disorders) to be not severe, and the degree of limitation in restriction of activities of daily living, difficulties

maintaining social functioning, and difficulties maintaining concentration, persistence or pace was rated as mild with no episodes of decompensation. (R. 155, 165). Dr. Shadid listed "Depression, NOS (not otherwise specified)" as plaintiff's disorder under 12.04. (R. 158). There was no evidence to support a "C" criteria. (R. 166).

Another agency RFC, this one physical, was also completed on January 6, 2005. (R. 169-176). Plaintiff was given the following RFC:

> Occasionally lift and/or carry (including upward pulling) 50 pounds;
> Frequently lift and/or carry (including upward pulling) 25 pounds;
> Stand and/or walk (with normal breaks) about 6 hours in an 8-hour workday;
> Sit (with normal breaks) for less than about 6 hours in an 8-hour workday;
> Push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry

(R. 169). Stooping is limited to occasional, and plaintiff is to "avoid unprotected sunlight exposure." (R. 171-172).

Amy Humphrey, LLSW-P completed a mental RFC for plaintiff on October 30, 2007. (R. 349-351). Plaintiff was rated with moderate limitations in the areas of being able to work in coordination or proximity to others without being distracted by them, her ability to interact appropriately with the general public, her ability to accept instruction and respond appropriately to supervisor criticism, and her ability to respond appropriately to changes in the work setting. (R. 349-350).

Plaintiff's treating physician, Kelley Joy, D.O., submitted a statement that plaintiff's complaints of migraines, back pain, inability to concentrate because of ADHD, anxiety and panic attacks were credible. (R. 353). Dr. Joy opined that as of October 2, 2007, plaintiff was not a candidate for full time work, stating she would require at least "0-3" unscheduled breaks during the workday and would likely miss "4-8" days per month. Id. Dr. Joy also submitted a RFC

form for plaintiff dated February 28, 2008, reflecting several marked limitations and one severe limitation (plaintiff's ability to complete a normal workday and workweek without interruption from psychologically based symptoms) in Dr. Joy's opinion. (R. 397-399). This RFC is noted to cover the time period of July 1, 2004 to February 28, 2008 ("the present"). (R. 399).

## **Procedural History**

Plaintiff alleges her impairments are "X-linked ocular albinism/scoliosis/back pain." (R. 129). In assessing plaintiff's qualifications for disability, the ALJ first stated plaintiff met the insured status requirements of the Act through June 30, 2007. Next, he determined at step one of the five step sequential process that plaintiff had not been engaged in substantial gainful activity since June 1, 2004, her alleged onset date. (R. 19). At step two, the ALJ found plaintiff to have the following severe impairments:

> … problems with her vision, back, headaches, stomach, bladder, neck, feet, legs, hands, heart, hip and depression and anxiety.

Id.

At step three, the ALJ determined plaintiff's impairments did not meet the requirements of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (R. 20).

Before moving to the fourth step, the ALJ found plaintiff had the residual functional capacity ("RFC") to perform work as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to lift and/or carry 20 pounds, stand and/or walk 6 hours in an 8 hour workday at 45 minute intervals, sit 6 hours in an 8 hour workday at 2 hour intervals, and occasionally climb, bend, stoop, squat, kneel, crouch, crawl, operate foot controls with her left lower extremity, push and/or pull, reach overhead, and twist her head. The [plaintiff] requires low noise/low light environments and is slightly limited in reference to fingering, feeling and gripping. The claimant should avoid fine vision, rough uneven

> surfaces, unprotected heights, and fast and dangerous machinery and she requires easy accessibility to rest rooms. Additionally, the [plaintiff] can perform only simple, repetitive and routine tasks and is slightly limited in reference to contact with the general public, co-workers and supervisors.

(R. 20).

At step four, the ALJ determined that plaintiff was incapable of performing any past relevant work. (R. 29).

Plaintiff was 29 years old at the time of her alleged disability onset date, and as such, defined as a "younger individual." Id. The ALJ determined transferability of job skills was immaterial to the determination of disability, as the Medical-Vocational Rules supported a finding that plaintiff is "not disabled," whether or not she has transferable skills. (R. 30).

At step five, the ALJ determined jobs existed in significant numbers in the national economy plaintiff could perform. Id.

The ALJ concluded that plaintiff was not disabled under the Act from June 1, 2004, through the date of the decision. Id.

## Issues Raised

Plaintiff's allegations of error by the ALJ are as follows:

1. The ALJ failed to provide plaintiff procedural due process;
2. The ALJ failed to perform a proper evaluation of plaintiff's mental limitations;
3. The ALJ failed to properly consider the medical source information;
4. The ALJ failed at step five of the sequential evaluation process; and
5. The ALJ failed to perform a proper credibility determination.

(Dkt. # 22 at 2).

**Review of Issues**

Plaintiff first alleges the ALJ failed to provide plaintiff procedural due process, stating the ALJ "sent his own interrogatories to the first mental CE without asking [plaintiff] or [plaintiff's] counsel for input regarding his interrogatories" and by not issuing subpoenas to have each of the supplemental consultative examiners appear at the supplemental hearing to be cross-examined. (Dkt. # 22 at 2-3). The Court disagrees.

Plaintiff presents HALLEX references with no agency regulations and little case law to develop her argument.[6] Id. The case plaintiff relies on is Allison v. Heckler, 711 F.2d 145, 147 (10th Cir. 1983). In Allison, the ALJ concluded that the *pro se* plaintiff was not disabled based on a consultative report from a non-examining agency physician. The plaintiff was given no notice of the post-hearing report, no opportunity to cross-examine the doctor, and no supplemental hearing was held to afford her the opportunity to offer evidence in rebuttal. Allison focuses on the ALJ's reliance on the post-hearing report to determine that the plaintiff was not disabled. The denial of due process occurred when the ALJ failed to allow the plaintiff an opportunity to either cross-examine the physician or rebut his report in a supplemental hearing. The Tenth Circuit reversed and remanded the case for further proceedings, stating that if the Secretary wished to reopen the hearing and properly admit the report, plaintiff should be afforded the opportunity to subpoena and cross-examine the physician, and to offer rebuttal evidence. Allison, 711 F.2d at 147. Plaintiff also argues that the agency physician in question in Allison was a non-examining physician whose opinion should not have been given controlling

---

[6] The first HALLEX reference listed by plaintiff is HALLEX I-5-4-59C6, which is an internal agency reference to a class action lawsuit which provided relief for class participants through 1995  This reference does not apply to this case.

weight. The Tenth Circuit decided they did not need to address that issue as the case was being remanded. Id., at 148.

There are key differences between Allison and the present case. Plaintiff was represented by competent counsel, and the ALJ informed plaintiff that his decision would not be forthcoming until he received the consultative examination reports he ordered. (R. 457-459). The ALJ received the reports from Dr. Hickman and Dr. Reddy and sent the reports to plaintiff's counsel in a letter dated March 13, 2007, which detailed plaintiff's rights as follows:

> You may submit any or all of the following: written comments concerning the enclosed evidence, a written statement as to the facts and law you believe apply to the case in light of that evidence, and any additional records you wish me to consider (including a report from the treating physician). You may also submit written questions to be sent to the author(s) of the enclosed reports.
>
> You may also request a supplemental hearing at which you would have the opportunity to appear, testify, produce witnesses, and submit additional evidence and written or oral statements concerning the facts and law. If you request a supplemental hearing, I will grant the request unless I receive additional records that support a fully favorable decision. In addition, you may request an opportunity to question witnesses, including the author(s) of the enclosed report(s). I will grant a request to question a witness **if I determine that questioning the witness is needed to inquire fully into the issues**. If an individual declines a request by me to appear voluntarily for questioning, I will consider whether to issue a subpoena to require his or her appearance.
>
> You may request that I issue a subpoena to require the attendance of witnesses or the submission of records. You must submit a subpoena request, in writing, no later than 5 days before the date of any supplemental hearing. Any request that I issue a subpoena must provide the names of the witnesses or documents to be provided; the address or location of the witnesses or documents with sufficient detail to find them; a statement of the important facts that the witness or document is expected to prove; and the reason why these facts cannot be proven without issuing a subpoena. **I will issue a subpoena if reasonably necessary for the full presentation of the case.**

(R. 136) (emphasis added). As to subpoenas, the applicable Code of Federal Regulations states:

> (d) *Subpoenas.* (1) When it is reasonably necessary for the full presentation of a case, an administrative law judge or a member of the Appeals Council **may**, on

> his or her own initiative or at the request of a party, issue subpoenas for the appearance and testimony of witnesses and for the production of books, records, correspondence, papers, or other documents that are material to an issue at the hearing.

20 C.F.R. §§ 404.950(d), 416.1450(d) (emphasis added).

Plaintiff's counsel submitted a letter to the ALJ on March 17, 2007, in which he requested a supplemental hearing and requested both supplemental consultative examiners be in attendance. The letter stated:

> If you are unable to make a fully favorable decision in Ms. Burns' case, please grant a supplemental hearing with both the mental and physical consultative examiners in attendance so that I may question them fully under oath. Of the mental consultative examiner I would ask at least the following:
>
> - How would Ms. Burns' markedly slow motor function on the left affect her during a full 8-hour day of reaching, grasping, and fingering?
> - Why is there no Axis II diagnosis on an individual who has had an MMPI test? Does she or does she not have a personality disorder, and if so, what is it?
> - How does her marked inability to concentrate and retrieve information translate to no limitation in areas 4, 5, and 8?
> - How can her described episodic mood swings translate to no significant limitation in areas 7 and 11 and no limitation in area 9?
> - How can an individual who demonstrates a marked inability to concentrate have only a moderate limitation in this area?
> - How does an individual with marked mood swings and panic attacks have no limitation in areas 14 and 15?
>
> My questions for the physical consultative examiner would be as follows:
>
> - How long did your examination of Ms. Burns take?
> - How are there 20 hours in an 8-hour work day? Do you even know how to rate an individual's ability to sit, stand and walk? How did you arrive at your answers as recorded?
> - Did you measure the ranges of motion recorded on your examination with an inclinometer?
> - When you record "functional" range of motion, what, exactly, do you mean?
> - Does the ability to grasp a hammer, oppose the thumb to the fingertips and manipulate small objects during an office examination which is

15

>> limited in time actually mean that an individual can grasp, handle, and finger for a full 8-hour day?
> - What is the normal pulse rate of an individual?
> - How does a decreased sensory examination in both feet yield a normal sensory examination?

(R. 138-139).

The ALJ mailed answers from the consultative examiners to plaintiff's counsel with a letter dated August 2, 2007, again outlining plaintiff's rights.[7] (R. 140). Plaintiff's counsel sent the ALJ another letter, dated August 9, 2007, which stated as follows:

> I am in receipt of the interrogatories answered by Drs. Hickman and Reddy. I have no objection to their being submitted into evidence.
>
> I do, however, think that a few of Dr. Reddy's answers were not dispositive of the questions asked and would request that you subpoena him for a supplemental hearing, should you conclude that you cannot make a finding of disability based on the information in [sic] file.
>
> Should you make the determination that she is not disabled, the grant of a supplement hearing will afford me the time to update her file with the recent evidence she has accumulated.

(R. 142).

Dr. Hickman responded to questions from the Office of Disability Adjucation and Review, ultimately stating his opinion that plaintiff would have moderate intermittent disruptions to her attention, concentration, and pace due to her chronic pain, depression and anxiety. (R. 313). Plaintiff did not object to Dr. Hickman's answers to interrogatories, or let the ALJ know he disagreed with the questions sent to Dr. Hickman until the supplemental hearing, where he objected to both Dr. Hickman and Dr. Reddy. (R. 142, 463-465). Thus, plaintiff has waived her argument with respect to Dr. Hickman.

---

[7] See *supra*.

As to Dr. Reddy, he responded to the questions posed by plaintiff's attorney. (R. 314-315). More importantly, the ALJ was not obligated to require Dr. Reddy to attend the supplemental hearing. 20 C.F.R. §§ 404.950(d), 416.1450(d). The ALJ could have taken this step if he deemed it ". . . reasonably necessary for the full presentation of a case." Id.

Plaintiff was not deprived of any right to due process.

Plaintiff next alleges the ALJ failed to perform a proper evaluation of plaintiff's mental limitations, claiming the ALJ did not employ the "special technique" designed to evaluate mental impairments required by 20 C.F.R. §§ 404.1520a, 416.920a. (Dkt. # 22 at 3). The Court agrees.

When faced with a claim of mental impairment, the ALJ must apply this "special technique" to "rate the degree of functional limitation resulting from the impairment(s)" after a claimant has established a medically determinable mental impairment. Id. The ALJ must rate the claimant's limitations in "four broad functional areas," which are "activities of daily living; social functioning; concentration; persistence, or pace; and episodes of decompensation." 20 C.F.R. §§404.1520a(c)(3); 416.920a(c)(3). He then must use the functional-limitation ratings to determine the severity of the mental impairment(s). Id. §§ 404.1520a(d), 416.920a(d). In order to document the application of the special technique, the ALJ's "written decision must incorporate the pertinent findings and conclusions based on the technique… The decision must include a specific finding as to the degree of limitation in each of the functional areas…." Id. §§ 404.1520a(e)(2), 416.920a(e)(2).

In the present case, the ALJ found plaintiff's depression and anxiety both severe impairments. (R. 19). However, the ALJ did not elaborate on the process of his findings, beyond stating:

> The Administrative Law Judge has carefully compared the claimant's signs, symptoms, and laboratory findings with the criteria specified in all of the Listings of Impairments. The Administrative Law Judge has placed specific emphasis upon sections … 12.04-(pertaining to affective mood disorders) and 12.06-(pertaining to anxiety-related disorders). … Based upon this analysis, the Administrative Law Judge finds that the [plaintiff's] impairments do not meet or equal the criteria established for an impairment shown in the Listings of Impairments in Appendix 1, Subpart P, and Regulations No. 4. …

(R. 19-20). While recognizing the existence of an impairment, the ALJ rated its severity without first making the required findings in each of the four broad functional areas. He failed to mention any findings under paragraph B or C of 12.04 or 12.06 to explain why plaintiff did not meet a listing.

This error is dispositive of this appeal, since plaintiff's claims will need to be reevaluated by the ALJ in light of his application of the special technique in accordance with 20 C.F.R. §§ 404.1520a, 416.920a.

## Conclusion

The decision of the Commissioner finding plaintiff not disabled is hereby REVERSED and REMANDED for further proceedings that are consistent with this Opinion and Order.

SO ORDERED this 14th day of December, 2010.

_____
T. Lane Wilson
United States Magistrate Judge